# Supreme Court of Louisiana

FOR IMMEDIATE NEWS RELEASE

NEWS RELEASE #023

FROM: CLERK OF SUPREME COURT OF LOUISIANA

The Opinions handed down on the **9th day of May, 2025** are as follows:

**PER CURIAM:**

2024-CK-00491     *STATE OF LOUISIANA   VS.  K.B. (Parish of Jefferson)*

REVERSED AND REMANDED. SEE PER CURIAM.

Weimer, C.J., additionally concurs and assigns reasons.
Crain, J., dissents and assigns reasons.
McCallum, J., concurs in the result.

# SUPREME COURT OF LOUISIANA

## No. 2024-CK-00491

## STATE OF LOUISIANA

## VS.

## K.B.

On Supervisory Writ to the Juvenile Court, Parish of Jefferson

**PER CURIAM:**[*]

We granted writs to examine whether the juvenile court abused its discretion in denying K.B.'s motion to suppress. After reviewing the record and jurisprudence, we find it did. Specifically, we find that there was no reasonable suspicion to justify stopping K.B. and the State failed to carry its burden of proving the evidence was obtained pursuant to the narrow exception to the warrant requirement for investigatory stops. We therefore reverse the juvenile court's ruling and hereby rule the evidence must be suppressed and excluded.

The only witness at the motion hearing was Lt. Steven Verrett, a 21-year veteran of the Gretna Police Department. He was patrolling in his marked unit after 10:00 p.m., on Saturday, October 21, 2023. As he headed south on Lafayette Street, he observed four males heading north. He could not discern their ages. Two were riding bicycles; the other two were walking.

Lt. Verrett turned around and parked in a Circle K convenience store lot, observing the foursome briefly. He noticed one of the two males walking was wearing a black sweatshirt with large letters printed on it, which Lt. Verrett said was similar to a shirt worn by a subject in a car theft reported at some point on the previous day (as captured in grainy surveillance footage). The address of the theft

---

[*]Justice Jeannette Theriot Knoll, retired, heard this case as Justice Pro Tempore, sitting in the vacant seat for District 3 of the Louisiana Supreme Court. She is now appearing as Justice ad hoc for Justice Cade R. Cole.

was noted, but the distance between it and the place Lt. Verrett observed the four males on Lafayette Street was not adduced. Lt. Verrett provided no other details about the reported theft, and he conceded it is common to "see people with sweatshirts with large writing on them."

Lt. Verrett testified that the demeanor of the male wearing the noted shirt "changed" upon seeing the officer. Lt. Verrett described that person as having red and black dreadlocked style hair. As that person walked past Lt. Verrett's car, he "put his head in a downward motion; and the way his hair was fixed, it covered his face." Lt. Verrett testified that he found this suspicious.

After the dreadlocked person and three others passed his marked unit, Lt. Verrett circled the block and promptly attempted a stop using his PA system, commanding them to "put their bikes down." Lt. Verrett testified his intention was to stop all four individuals.

At that point, he testified that the juvenile herein, K.B., who was riding one of the two bikes, "began to peddle off" and in doing so crossed Lt. Verrett's driver's door path. The officer's explanation of K.B.'s reaction was not entirely clear, however, as Lt. Verrett also testified that K.B. was "putting his bike down" before he took him down. The three other individuals, including the dreadlocked person, ran in the opposite direction and were not apprehended.

Lt. Verrett exited his car and immediately knocked K.B. to the ground and detained him. Once he had K.B. detained, Lt. Verrett performed a pat down to "make sure he didn't have anything that could harm me or illegal on him." Lt. Verrett frisked K.B.'s waistband and legs and did not find anything of interest.

Lt. Verrett then proceeded to unzip K.B.'s jacket and, beneath the jacket, found an item "skin-tight" across his chest. Lt. Verrett testified that he "learned, through [this] incident, that they are starting to wear [the satchels] that come across their chest. And they wear them like skintight to the chest because officers are known

2

to just concentrate on the waist and/or around the legs." Upon finding the satchel, Lt. Verrett testified that he squeezed it and felt a firearm inside it. The officer opened the bag and found cannabis and a loaded gun inside.

The juvenile court asked Lt. Verrett clarifying questions. In particular, the court was interested in the amount of time between Lt. Verrett detaining K.B. and discovering the satchel. Lt. Verrett confirmed it was "within seconds" of beginning his search. The officer's testimony also indicated he already had K.B. restrained in handcuffs at the time of the search.

The juvenile court denied the motion to suppress because it found the dreadlocked person's shirt and downward gaze created reasonable suspicion to stop the whole group. The court also found the search permissible for officer safety and the detection of the gun within the scope of that search.

The court of appeal denied writs. *State v. K.B.*, 24-0066 (La. App. 5 Cir. 3/20/24) (unpub'd). It agreed with the juvenile court that there was reasonable suspicion because, although K.B. did not initially arouse suspicion, he did not stop in response to the officer's command. Having found the stop justified, the court of appeal found Lt. Verrett acted within reason to conduct a pat down because he was working alone after dark and the group "scattered when he told them to get off their bikes." *K.B.*, 24-0066 at p. 6. Going further, because the officer unzipped K.B.'s jacket "within seconds" of detaining him, the court of appeal found it was a "limited intrusion" permissible for officer safety. *Id.* (citing *Adams v. Williams*, 407 U.S. 143, 148, 92 S.Ct. 1921, 1924, 32 L.Ed.2d 612 (1972)). Because it also found the officer located the gun under the "plain feel" exception, the court of appeal concluded there was no Fourth Amendment violation. *K.B.*, 24-0066 at p. 7.

Article I, Section 5 of the Louisiana Constitution and the Fourth Amendment to the United States Constitution protect individuals from unreasonable search and seizure. Accordingly, when the State has secured evidence without a warrant, as it

3

has done in this case, the State bears the burden of proving its admissibility under one of the narrow exceptions to the warrant requirement. *See* La.C.Cr.P. art. 703(D). A ruling on a motion to suppress is afforded great deference and will not be set aside absent an abuse of discretion. *State v. Wells*, 08-2262, p. 5 (La. 7/6/10), 45 So.3d 577, 581.

The jurisprudence recognizes three types of police-citizen interactions with accompanying levels of justification required when there is no warrant: (1) arrests, which must be supported by probable cause, *see Maryland v. Pringle*, 540 U.S. 366, 370, 124 S.Ct. 795, 799, 157 L.Ed.2d 769 (2003); (2) brief investigatory stops, which must be supported by reasonable and articulable suspicion of criminal activity, *see Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968); and (3) brief consensual encounters, which require no objective justification and are not compulsory for the citizen, *see Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991). *See generally State v. Martin*, 11-0082, p. 6 (La. 10/25/11), 79 So.3d 951, 955-56 (recognizing these levels of justification under Louisiana law).

The *Terry* exception for investigatory stops is codified in Louisiana at La.C.Cr.P. art. 215.1. Under Art. 215.1(A), "[a] law enforcement officer may stop a person in a public place whom he reasonably suspects is committing, has committed, or is about to commit an offense and may demand of him his name, address, and an explanation of his actions." Absent reasonable suspicion, the individual remains free to choose whether to comply with the officer's request. *See Martin*, 11-0082 at p. 8, 79 So.3d at 956–57 ("Police remain free to approach an individual on the street to engage him in conversation, which may include questions which invite an incriminating response, and may also ask for some identification without implicating the Fourth Amendment."). Once an officer has made an unmistakable show of authority indicating the person is not free to leave, the encounter has blossomed into

4

a forcible detention, requiring at a minimum reasonable suspicion. *Martin.*, 11-0082 at p. 7, 79 So.3d at 956.[1]

Because Lt. Verrett made an "unmistakable show of authority" *see Martin*, 11-0082 at p. 13, 79 So.3d at 960, when he commanded K.B. to stop and forcibly detained him at the inception of the encounter, the question is whether, considering the totality of the circumstances, Lt. Verrett reasonably suspected K.B. was committing, had committed, or was about to commit an offense.

"Reasonable suspicion" is a less demanding standard than the probable cause needed to justify an arrest; it requires some minimal level of objective justification for making a stop. *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1. It is not enough that an officer has an inchoate, unparticularized suspicion or "hunch" about an individual, instead, all inferences must be reasonably drawn based on the officer's training and experience and based on articulable facts. *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883.

Reviewing courts must consider the totality of the circumstances to decide whether an officer had a particularized, objective basis for suspecting criminal activity. *Sokolow*, 490 U.S. at 7-8, 109 S.Ct. at 1585 (citing *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883). Relevant circumstances include but are not limited to a subject's actions before the stop is initiated, the officer's prior knowledge of the subject, if any, the officer's awareness that an area is known for high crime rates, the officer's awareness of recent crime reports or tips, the time of day or night, and ambient lighting conditions. *See State v. Morgan*, 09-2352, p. 10 (La. 3/15/11), 59 So.3d 403,

---

[1] Not all police-citizen encounters are "seizures." *Terry*, 392 U.S. at 19 n.16, 88 S.Ct. at 1879. A true "seizure" for Fourth Amendment purposes occurs "when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Id.* "Under Louisiana's slightly broader definition of the term, a seizure may also occur 'when the police come upon an individual with such force that, regardless of the individual's attempt to flee or elude the encounter, an actual stop of the individual is virtually certain [to occur].'" *State v. Sylvester*, 01-0607, p. 3 (La. 9/20/02), 826 So.2d 1106, 1108 (alteration in original, quoting *State v. Tucker*, 626 So.2d 707, 712 (La. 1993)).

409. Generally, there ought to be a combination of factors to give rise to reasonable suspicion. For example, one's presence in a "high-crime area," without more, is insufficient. *Illinois v. Wardlow*, 528 U.S. 119, 124, 120 S.Ct. 673, 676, 145 L.Ed.2d 570 (2000). Nervousness or evasive behavior is pertinent. *Wardlow*, 528 U.S. at 124, 120 S.Ct. at 676 (collecting authorities). In *Wardlow*, the United States Supreme Court found a subject's unprovoked flight in a high-crime area sufficient to generate reasonable suspicion. 528 U.S. at 124, 120 S.Ct. at 676. But the Supreme Court refused to adopt a per se rule regarding flight. Instead, the whole picture must be considered in each case. *Wardlow*, 528 U.S. at 124, 120 S.Ct. at 676; *see also State v. Belton*, 441 So.2d 1195, 1197 (La. 1983).

Given the suspicion aroused by a subject's flight, "the amount of additional information required in order to provide officers a reasonable suspicion that an individual is engaged in criminal behavior is greatly lessened." *State v. Benjamin*, 97-3065, p. 3 (La. 12/1/98), 722 So.2d 988, 989. Nevertheless, the timing of the flight in relation to other relevant factors is often decisive. For example, in *State v. Lewis*, there was reasonable suspicion under the totality of circumstances, which included area residents' complaints of increased drug activity, officers' awareness of the "hot spot" nature of the area for drug trade, the subject's nervousness, and his unprovoked flight as the officer approached on foot to ask questions. 00-3136 at p. 5 (La. 4/26/02), 815 So.2d 818, 821, *cert. denied*, 537 U.S. 922, 123 S.Ct. 312, 154 L.Ed.2d 211 (2002). This Court observed that the officers did not need reasonable suspicion to simply approach and ask questions, but once the subject took off running upon being engaged verbally by the officer, there arose sufficient objective grounds to make an investigatory stop in light of the other factors, especially the officers' prior awareness of the residents' complaints of an uptick in drug activity there, the officers' familiarity with most of the area's residents, as well as the "hot spot" nature of the housing project, and the subject's visible nervousness as they

6

approached. *Lewis*, 00-3136, p. 5, 815 So.2d at 821. Given this convergence of factors, there was a sufficient basis for an investigatory stop and the evidence seized after the subject discarded it during his flight was admissible.

In *State v. Belton*, the subject's flight from approaching officers, coupled with the officers' knowledge he was standing outside a "known ... hangout for drug dealers and armed robber[s]," and that the officers were familiar with the subject dealing narcotics because they had previously taken drugs from him, was enough to create reasonable suspicion. 441 So.2d at 1197-99.

Much the same, in *State v. Johnson*, a subject quickening his pace to a "near run," compounded with the lateness of the hour (just after midnight), the high-crime character of the area (known drug hot spot in a housing project), and the subject repeatedly glancing back over his shoulder, created objective justification for an investigatory stop. 01-2081, p. 3 (La. 4/26/02), 815 So.2d 809, 811.[2]

But a startled reaction or flight *alone*, without more, is insufficient. Unlike the confluence of factors in the cases above, merely asserting one's right to walk away is not enough to justify an investigatory stop. The United States Supreme Court has "consistently held that a refusal to cooperate, without more, does not furnish the minimal level of objective justification needed for a detention or seizure." *Bostick*, 501 U.S. at 437, 111 S.Ct. at 2387 (citations omitted). This Court, too, has made clear that "officers may not stop or forcibly detain a person or approach citizens 'under circumstances that make it seem that some form of detention is imminent *unless they have probable cause to arrest the individual or reasonable grounds to detain the individual.*'" *State v. Williams,* 421 So.2d 874, 876 (La. 1982) (emphasis added). Thus, whereas unprovoked flight before police initiate an encounter may

---

[2] Further illustrating the significance of flight, the Court found reasonable suspicion in *State v. Benjamin*, despite that the only factor in addition to the subject's flight was the fact that he had first clutched his waistband as if supporting a hidden weapon. *Benjamin*, 97-3065 at p. 3, 722 So.2d at 989.

7

contribute to a finding of reasonable suspicion if other objective grounds for suspicion were apparent before the subject fled, an individual choosing to exercise his right to avoid questioning is, in and of itself, not enough.

Here, K.B. argues Lt. Verrett's testimony shows he lacked reasonable suspicion to stop K.B. or his companions. According to the officer's testimony, he was not suspicious of K.B. but of another individual nearby. And, according to Lt. Verrett, he was suspicious of that other individual because (1) he was wearing a shirt with large lettering printed on it, and grainy surveillance footage of a car theft over a mile away, the previous day, showed a suspect wearing a similar shirt; and (2) that individual turned his head down as he walked past the officer. K.B. argues these observations, without more, were insufficient to create reasonable suspicion to forcibly stop that other individual, and certainly were inadequate to stop K.B. and others nearby. K.B. notes that shirts with lettering printed on them are as ubiquitous as Nike shoes and Saints hats, and there were no other traits corresponding between the theft suspect and the dreadlocked person. For example, the officer did not say whether the theft suspect also had dreadlocks or was even a male.

The State counters that Lt. Verrett's decision to stop the whole group was justified because of his suspicion about the dreadlocked person, the time of night, and because it would have been "logistically impossible" to stop only the person of interest. The State says the circumstances here are like those in *Morgan*, 09-2352, 59 So.3d 403, where there was reasonable suspicion based in part on the subject's flight. Further, the State submits, because there is no recognized right to resist a *Terry* stop, K.B.'s seizure was lawful.

Our review shows K.B. is correct. As a starting point, *Morgan* is distinguishable. In that case, the lone subject was walking on a poorly lit road at the much later hour of 1:45 a.m. and, when he saw a marked police car, he "immediately took off running in the opposite direction" and ran for several blocks. *Morgan*, 09-

8

2352 at pp. 12–13, 59 So.3d at 410-11. The officer in *Morgan* had not yet turned on his emergency lights, shown his weapon, nor called out to the subject before he ran. Considering it was an hour when "most people are inside or in bed," the area was dimly lit, the flight was completely "unprovoked," and the subject was nervous when engaging with the officer, the officer reasonably suspected illicit activity. *Morgan*, 09-2352 at pp. 2, 12-14, 59 So.3d at 405, 411.

Here, in contrast, it was just after 10:00 p.m. on a Saturday night, an hour when some, but certainly not all, law-abiding people may be in bed. There was no testimony about there being poor lighting in the area, which Lt. Verrett testified was near a convenience store, and K.B. and the others did not flee until after Lt. Verrett commanded them to stop. Perhaps most significant, Lt. Verrett's testimony is unclear whether K.B. in fact made any significant effort to evade him: Lt. Verrett testified that K.B. crossed his driver's door path and "began to peddle off" and, conversely, that K.B. had started to put his bike down before the officer physically confronted him and knocked him down.

Moreover, to the extent the State urges K.B.'s presence near the dreadlocked person created a reasonable basis to suspect K.B. of being involved in crime, the State ignores the weaknesses in its position. First, is the paucity of evidence to create reasonable suspicion about even the dreadlocked person. Even if Lt. Verrett had testified that the shirt he wore was *exactly* the same as the one worn by the theft suspect, which he did not, there was no other connection drawn between the theft and the dreadlocked person and no parallels identified between these circumstances and those surrounding the reported theft. A ubiquitous article of clothing is not enough to link someone to a crime committed the day before in another location at an unspecified time. Without anything else to connect any of the four people here with the theft reported the day before, such as it having happened at a similar hour, the basis for Lt. Verrett wanting to stop even the dreadlocked person was deficient.

The state has highlighted the "late hour" as contributing to reasonable suspicion, but Lt. Verrett did not address whether or why in his experience the early part of the 10:00 p.m. hour on a Saturday night is a concerning hour for persons to be outside a convenience store, nor did he describe the ambient lighting conditions. Lt. Verrett did not suspect these individuals were juveniles (as may be relevant to curfew),[3] and there was no indication the area struggled with high crime rates, or any other conditions which would reasonably give rise to suspicion of illicit conduct. Surely, walking or riding a bicycle away from a convenience store during the early part of the 10:00 p.m. hour, without more, is not indicative of criminality.

Even assuming *arguendo* there was a legitimate basis to stop the dreadlocked person, there was no basis to stop K.B. Lt. Verrett made no observations at all about K.B. before commanding him to stop, beyond the fact that he was riding a bicycle. If Lt. Verrett wanted to question K.B., he was entitled to approach and engage him for a consensual exchange. But the Fourth Amendment demands that when an officer lacks reasonable suspicion to forcibly stop an individual, that individual "need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way." *Florida v. Royer*, 460 U.S. 491, 497-98, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). This is why we must also reject the State's argument that, because there is no statutory right in Louisiana to resist an unlawful investigatory stop, K.B. was obliged to comply with the officer's command.[4] To the

---

[3] In contrast, in *State v. Sims*, 02-2208, p. 5 (La. 6/27/03), 851 So.2d 1039, 1043, this Court found reasonable suspicion to support an investigatory stop of a subject in an "area that had recently seen an increased amount of residence burglaries, which, the officers suspected, were being committed in large part by juveniles." Because when "the officers observed defendant, it was past curfew, and, according to the officers, defendant looked very young," they had reason to investigate. Notably, however, as discussed below, the officers were not justified in conducting a frisk or searching the subject for weapons because there were no objective reasons to suspect that he posed a danger. *Sims*, 02-2208 at pp. 6-7, 851 So.2d at 1043-44 (subject's nervousness not enough to suggest danger).

[4] Louisiana has long followed a rule that an individual may resist an unlawful arrest. *State v. Lindsay*, 388 So. 2d 781, 782 (La. 1980). Notably, however, nothing in Lt. Verrett's testimony indicates K.B. did anything to counter or resist the officer physically knocking him to the ground and handcuffing him, and K.B. has not been charged with resisting an officer. Even granting that

10

contrary, as the United States Supreme Court has made clear, although "officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place" and asking if he is willing to answer some questions, a person "may not be detained even momentarily without reasonable, objective grounds for doing so; *and his refusal to listen or answer does not, without more, furnish those grounds." Royer*, 460 U.S. at 497-98, 103 S.Ct. at 1324 (emphasis added) (citing *United States v. Mendenhall*, 446 U.S. 544, 556, 100 S.Ct. 1870, 1878, 64 L.Ed.2d 497 (1980) and *Terry*, 392 U.S. at 31-33, 88 S.Ct. at 1885-86).

Further, any suspicion Lt. Verrett had about the dreadlocked person did not automatically transfer to the others, nor did it justify a decision to corral the foursome. This is because suspicions are not transferrable among companions absent some basis giving rise to reasonable suspicion as to the companion(s). *See State v. Boyer*, 07-0476, p. 8 (La. 10/16/07), 967 So.2d 458, 464 ("mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." (citing *Ybarra v. Illinois*, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979)). We therefore cannot endorse the State's effort to package the four persons here neatly together based on perceived logistical difficulties.[5] We recognize law enforcement officers are routinely tasked with executing challenging maneuvers as they carry out their duties. But we cannot agree that this consideration justifies infringement on an individual's constitutional rights to remain at liberty and maintain privacy.

---

there is no statutorily recognized right to forcefully resist a *Terry* stop, it does not follow that an individual for whom there existed no reasonable suspicion to stop can be penalized for seeking to exercise his constitutional right to decline questioning.

[5] In arguing about the logistics involved in stopping just one person among a group, the State overlooks that Lt. Verrett could have parked (or remain parked), exited his car on foot, and walked to approach the dreadlocked person and the others, to ask whatever questions he felt appropriate to "dispel" his suspicion (reasonable or not) that the dreadlocked person was involved in the theft.

This is not the first time this Court has expressed such a view. In *State v. Lanter*, police became interested in a female subject based on an anonymous tip that she was wanted for crime committed in another state. 391 So.2d 1152, 1154 (La. 1980). When police encountered the subject, she was with a male companion at 4:50 a.m. outside a coffee shop on Bourbon Street. *Lanter*, 391 So.2d at 1153. In reviewing the admissibility of evidence seized during the encounter, the Court recognized that the officers had "no reasonable cause to believe that [her companion] was engaged in criminal activity," despite his presence with the person of interest and even at such an odd hour. *Lanter*, 391 So.2d at 1154. Absent reasonable suspicion as to her companion, the unlabeled pill bottle officers removed from his back pocket, after he reached into his pocket in their presence, was obtained through an "unjustified interference with [his] right to be free from governmental interference," and without reasonable suspicion to justify the intrusion. *Lanter*, 391 So.2d at 1154. As the Court explained:

> [T]he detention was unlawful since the officers only had reasonable cause to believe that defendant's companion and not defendant was engaged in criminal activity. Hence, the subsequent search of defendant's person violated his rights under the fourth amendment and evidence seized as a result thereof is inadmissible.

*Lanter*, 391 So.2d at 1154.

Also instructive, in *State v. Purvis*, 96-787, p. 8 (La. App. 3 Cir. 12/11/96), 684 So.2d 567, 572, the court of appeal found the trial court erred in denying a motion to suppress because the officer's testimony indicated he acted on only a "hunch," based on his prior dealings with the subject and an observation that he was spending time outside his "known area." As in the instant case, the officer in *Purvis* had no prior knowledge of the subject's companion(s). The court of appeal found it telling that the officer had articulated no facts, other than the companion's "nervous behavior" to support his suspicion. The companion's presence with a person of interest was insufficient to create reasonable suspicion, despite the stop occurring in

12

a "high crime area," after dark, and involving a known criminal history by the person of interest, plus an observed traffic violation by the taxicab in which they were riding together. *Purvis*, 96-787, pp. 1-2, 684 So.2d at 568-69.

As in *Lanter* and *Purvis*, K.B. was wrongly swept into Lt. Verrett's net to the extent Lt. Verrett perceived his presence near the dreadlocked person as reason enough to forcibly stop him. Without reason to suspect K.B. of being involved in a crime, the evidence that he began to "pedal away" cannot support a finding of reasonable suspicion. As laid out above, a subject's action *after* a compulsory stop has been initiated cannot be used to retroactively justify the effort to stop him. Where this Court has found a subject's flight contributed to reasonable suspicion, it has done so only in combination with other objectively reasonable grounds for suspicion, applicable to the person in question. This is because "it is well-settled that police cannot actively create street encounters, . . . unless they have articulable knowledge of suspicious facts and circumstances sufficient to allow them to infringe upon the suspect's right to be free from governmental interference." *See State v. Williams*, 621 So.2d 199, 201 (La. App. 4 Cir. 1993) (citing *State v. Hathway*, 411 So.2d 1074, 1079 (La. 1982)).

In sum, because the circumstances show there was no reasonable suspicion to stop K.B., the juvenile court erred in denying his motion to suppress. The United States Supreme Court has observed that the rationale for suppressing evidence obtained in violation of the Fourth Amendment is to deter law enforcement from future such violations. *See Illinois v. Krull*, 480 U.S. 340, 348-49, 107 S.Ct. 1160, 1166, 94 L.Ed.2d 364 (1987) (evidence should be suppressed "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment."). Because the officer here had knowledge of the requirements and parameters of a *Terry* stop, we find the exclusionary rule applies.

Having found no justification for the stop, we decline to address the parties' remaining arguments about the scope of the search. We hereby reverse the juvenile court's ruling and grant the juvenile's motion to suppress. We remand for further proceedings consistent with the views expressed here.

**REVERSED AND REMANDED**

No. 2024-CK-00491

STATE OF LOUISIANA

VS.

K.B.

*On Supervisory Writ to the Juvenile Court, Parish of Jefferson*

**WEIMER, C.J.,** additionally concurring.

I fully agree with the majority opinion, but write separately to point out that the State also failed to carry its burden of proving the evidence was obtained pursuant to the narrow exception to the warrant requirement for investigatory stops. I offer the following analysis based on the full panoply of facts as they unfolded in this case following the improper investigatory stop. It is hoped law enforcement officers can benefit from the knowledge of limitations on warrantless searches.

Even when there exists reasonable suspicion for a **Terry** stop, the encounter does not involve the automatic right to perform a protective frisk or pat down. Instead, the officer must "reasonably suspect[] that he is in danger," before he can "frisk the outer clothing of such person for a dangerous weapon." La. C.Cr.P. art. 215.1(B);[1] **State v. Hunter**, 375 So.2d 99, 101 (La. 1979). Therefore, an officer may frisk a subject's outer clothing only if a reasonably prudent person in his position would be warranted in suspecting his safety or that of others is in danger. See La. C.Cr.P. art. 215.1(B); **Terry v. Ohio**, 392 U.S. 1, 27 (1968). The reasonableness of a frisk is governed by an objective standard. See **State v. Dumas**, 00-0862, p. 2 (La. 5/4/01), 786 So.2d 80, 81. Suspicion of danger is not reasonable

---

[1] The longstanding codal law is clear in articulating this limitation on law enforcement officers. Louisiana C.Cr.P. art. 215.1(B) provides: "When a law enforcement officer has stopped a person for questioning pursuant to this Article and reasonably suspects that he is in danger, he may frisk the outer clothing of such person for a dangerous weapon. If the law enforcement officer reasonably suspects the person possesses a dangerous weapon, he may search the person."

unless the officer can point to particular facts which led him to believe the individual was dangerous. **Sibron v. New York**, 392 U.S. 40, 64 (1968); **Hunter**, 375 So.2d at 101. Only when an officer reasonably suspects a subject possesses a weapon, may he go beyond a protective frisk and search the person. See La. C.Cr.P. art. 215.1(B).

In **State v. Sims**, this court found the protective frisk unlawful because the only reason the officer gave for his belief the subject might be dangerous was that the subject continued to appear nervous after officers ascertained he was not in violation of a curfew as they suspected in stopping him. **Sims**, 02-2208, p. 7 (La. 6/27/03), 851 So.2d 1039, 1044. The court explained that "[n]o court of this state has concluded that nervousness, absent additional aggravating factors, can form the basis for an officer's protective frisk search for weapons." *Id.* Because the frisk was based on nothing more than a hunch that the subject "could have been armed," it was unlawful. *Id.*, 02-2208 at 9, 851 So.2d at 1045.

Similarly, in **Hunter**, this court found the protective frisk unjustified. In that case, an unknown subject was stopped based on reasonable suspicion when officers saw him accessing the trunk of what officers believed to be an unmarked police car. Although the officers were justified under **Terry** in stopping to investigate, because there was "no indication [the subject] was or had been involved in the commission of a *violent* crime," there were no bulges in his clothing, nor were there any other visible signs he was armed, the pat-down was held to be unconstitutional. **Hunter**, 375 So.2d at 102 (emphasis added). Specifically, the officer testified that after ascertaining some initial information,

> I decided to frisk Mr. Hunter for any weapons for the possibility he had any weapons and I patted his waist first, and then I went into the area of ... I patted him on the chest, and when I hit his coat pocket, his left coat pocket, I felt a vial, a small vial, a symmetrical object, in his pocket, and also, a spoon.

2

*Id.*, 375 So.2d at 102. But because there was no objective sign the individual was dangerous or armed, the contraband was found to be obtained through an impermissible search:

> The weapons search was unlawful because, under the particular facts of the instant case, a reasonably prudent man would not have been warranted in the belief that the defendant was armed and dangerous. Since the unlawful weapons search led directly and immediately to the seizure of the vial and spoon, this evidence must be suppressed regardless of whether the officer acquired probable cause to arrest the defendant for possession of cocaine upon feeling the objects through his outer garments.

*Id.*, 375 So.2d at 102.

Here, in seeking to show Lt. Verrett was justified in patting down K.B.'s legs and waist, and then unzipping and feeling beneath his jacket, the State relies on these circumstances: it was after 10:00 p.m., Lt. Verrett was working alone, and he suspected K.B.'s companion may have been involved in a prior theft. The State urges that the concern for officer safety was obvious from these circumstances. In addition, the State urges that because Lt. Verrett learned *from this case* that "they" (whoever "they" are) are beginning to wear contraband satchels across their chests, the search going beneath K.B.'s outer clothing was proper under Article 215.1(B). The State acknowledges Lt. Verrett's testimony was not clear as to whether he actually felt any concern for his safety.

Even if Lt. Verrett's testimony clearly evinced why he suspected K.B. was dangerous, which it did not, because the officer's *subjective* view is irrelevant, the crux of the inquiry is whether the record reveals an objective basis from which to reasonably infer K.B. was dangerous, as necessary to justify a pat down of his outer clothing, or to suspect K.B. was armed with a weapon, as necessary to justify the fuller search Lt. Verrett performed. See La. C.Cr.P. art. 215.1(B).

Lt. Verrett was working alone, after dark, and the dynamics of one officer and four subjects admittedly evinces an imbalance in physicality. However, when Lt.

3

Verrett took K.B. down and handcuffed him, the other three subjects were gone. There was no testimony that any of them remained nearby or did anything threatening upon leaving. Moreover, beyond it being about 10:20 p.m., the record indicates no factors that courts generally consider in assessing the reasonableness of suspected dangerousness. Such factors include an indication the subject has been involved in some violence, visible bulges in his clothing, and furtive movements or gestures which could reasonably be viewed as attempting to conceal, secure, or access a weapon. See **Hunter**, 375 So.2d at 102; **State v. Marshall**, 46,457, pp. 7-8 (La.App. 2 Cir. 8/10/11), 70 So.3d 1106, 1111 (pat down justified where subject reacted to mere police presence by quickly attempting to leave and "immediately reached to his waistband and pocket area," which the officer's training suggested was an effort "to conceal something.")

None of these factors were implicated here. Lt. Verrett's testimony indicated only that the person with the dreadlocks wore a shirt similar to one worn by a person who stole a car the day before. Nothing indicated K.B. was involved in any crime, much less a violent one. Nothing Lt. Verrett observed before or after commanding K.B. to stop indicated K.B. did anything aggressive, reached toward anything, or sought to conceal anything. Lt. Verrett admitted he asked K.B. no questions and instead immediately handcuffed and searched him. The following timeline illustrates what happened during the stop:

- Lt. Verrett knocked K.B. down.
- Lt. Verrett handcuffed K.B.
- Up against his patrol car, Lt. Verrett patted down K.B.'s legs and waistband, finding nothing.
- Lt. Verrett then unzipped K.B.'s jacket and found a satchel draped across his chest, skin-tight.
- Lt. Verrett squeezed the satchel and felt the outline of a gun.

As Lt. Verrett explained, this all occurred "within seconds." However, there was no testimony to suggest K.B. posed any threat to officer safety. To the contrary,

4

the hearing transcript reflects a complete lack of information regarding anything K.B. may have done or said during the entirety of the encounter.

To the extent the State asserts K.B.'s attempt to flee signaled his dangerousness, its argument must fail. Rather than signaling any threat, K.B.'s flight was just as likely an indication of his own fearfulness as anything else. The United States Supreme Court Justices have recognized the potential, particularly among non-white members of the population, to believe contact with police can itself be dangerous.[2] Given the absence of any objective marker of wrongdoing, K.B.'s attempt to "pedal away" cannot justify a decision to tackle him and search beneath his jacket. K.B. was not the individual who the officer thought might potentially be involved in the car theft a day earlier.[3] As the court made clear in **Sims**, "unlike the thorough and intrusive search conducted incident to an *actual arrest*, the **Terry** frisk is limited to a more superficial pat-down of a suspect's outer clothing for the purpose of detecting weapons only," and only when there are reasonable indicators of dangerousness. **Sims**, 02-2208 at 11, 851 So.2d at 1046 (emphasis added); see also, e.g., **State v. Owens**, 26,952, pp. 6-7 (La.App. 2 Cir. 5/10/95), 655 So.2d 603, 607-08 (weapons search justified where subject had bulge near waistband and thrust his hand inside waistband during lawful **Terry** stop).

Given that the record shows Lt. Verrett immediately handcuffed K.B. and proceeded to pat him down and then open his closed jacket—and only then felt the outline of a gun inside a closed satchel, the State seeks to vindicate an unlawful search by pointing to circumstances that arose only *after* the officer violated the

---

[2] See **Illinois v. Wardlow**, 528 U.S. 119, 132-33 (Stevens, Souter, Ginsburg, and Breyer, JJ., concurring in part and dissenting in part) (footnotes omitted) ("For such a person, unprovoked flight is neither 'aberrant' nor 'abnormal.' Moreover, these concerns and fears are known to the police officers themselves, and are validated by law enforcement investigations into their own practices.").

[3] Although the dissent describes the crime the day before as "an unsolved carjacking, a violent felony crime," Lt. Verrett actually testified the crime was "theft of a vehicle."

5

Fourth Amendment. Accordingly, this case is more like **Sims** and **Hunter** where, instead of simply asking questions to ascertain what threat K.B. may pose, the officer swiftly detained and searched him, despite there being no objective sign of danger. **Hunter**, 375 So.2d at 101; see also **Sibron**, 392 U.S. at 64 (**Terry** protective search not reasonable unless the officer can point to particular facts which led him to believe the individual was dangerous). Moreover, because a reasonable person in Lt. Verrett's position, after handcuffing K.B. and patting down his legs and waist and finding nothing, would have had been assured K.B. posed no immediate threat, his decision to go further and open K.B.'s jacket and search beneath it violated **Terry** and La. C.Cr.P. art. 215.1(B). See also **Sibron**, 392 U.S. at 65 ("The search was not reasonably limited in scope to the accomplishment of the only goal which might conceivably have justified its inception—the protection of the officer by disarming a potentially dangerous man.").

Indeed, though irrelevant to the determination, Lt. Verrett admitted, as did the officer in **Sibron**, that his aim in searching K.B. included looking for "anything illegal." In asking this court to condone his sweeping conduct, the State asks the court to ignore the officer's actual testimony and instead infer Lt. Verrett was justified in feeling fearful, despite his not articulating any particularized facts from which such a reasonable perception can be inferred. Based on the record, I find his search was not justified.

I also find no merit to the State's argument that the gun was lawfully obtained under the "plain-feel" exception. The plain-feel exception, like the plain-view exception to the warrant requirement, demands as a precursor that police are acting lawfully when they detect the evidence in question. See **Minnesota v. Dickerson**, 508 U.S. 366, 375-76 (1993) ("If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond

6

that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context."); **Coolidge v. New Hampshire**, 403 U.S. 443 (1971) (footnote omitted) (discussing plain-view exception); **Harris v. United States**, 390 U.S. 234 (1968) (discussing plain-view exception).  Here, because the gun was "felt" during a search that exceeded the scope of **Terry** and La. C.Cr.P. art. 215.1(B), the discovery of the satchel and its contents was not lawful under the plain feel exception.

Finally, contrary to the findings of the lower courts, there is no authority to suggest, as the State has, that a pat down or fuller search was justified merely because it occurred quickly after K.B. was detained.  The court of appeal cited **Adams v. Williams**, 407 U.S. 143, 147-48 (1972), to support its finding that Lt. Verrett's "limited intrusion" into K.B.'s interior clothing was permissible, because it occurred "within seconds" of stopping him; however, **Adams** is readily distinguishable.

In **Adams**, an officer was investigating a tip from a known informant reporting that the subject was carrying narcotics and a concealed weapon in his waistband, sitting alone in a parked car in a high-crime area at 2:15 a.m.  Given these factors, the officer "had ample reason to fear for his safety" when he approached, especially when the subject "rolled down his window, rather than complying with the policeman's request to step out of the car so that his movements could more easily be seen." *Id.*, 407 U.S. at 147-48.  The revolver reportedly at the subject's waistband created a particular reason for the officer to be fearful and so the officer's action in reaching for the gun there "constituted a limited [and reasonable] intrusion designed to insure his safety." *Id.*, 407 U.S. at 148.  In contrast, there is no evidence Lt. Verrett's actions were motivated by any objective indicia of K.B.'s dangerousness, and the State's position demands reliance on the fruit of the search to retroactively justify it. *Cf.* **Sibron**, 392 U.S. at 63 ("It is axiomatic that an incident

7

search may not precede an arrest and serve as part of its justification."). Because the evidence was found in violation of the Fourth Amendment and La.C.Cr.P. art. 215.1, it must be suppressed.

A series of unconstitutional acts that ultimately yields evidence cannot be justified after the fact simply because evidence is found. Evidence discovered as a result of an illegal search in violation of the Fourth Amendment must be excluded from evidence as "fruit of the poisonous tree."[4] To find a search legal based on what is found during the search would turn the Fourth Amendment upside down and completely eradicate the longstanding fruit of the poisonous tree doctrine.

---

[4] "Fruit of the poisonous tree" is a figure of speech drawn from **Wong Sun v. United States**, 371 U.S. 471, 488 (1963), which held that evidence and witnesses discovered as a result of a search in violation of the Fourth Amendment must be excluded from evidence. See **State v. Bartie**, 19-01727, p. 11 (La. 9/9/20), 340 So.3d 810, 815-16.

# SUPREME COURT OF LOUISIANA

# No. 2024-CK-00491

# STATE OF LOUISIANA

# VS.

# K.B.

On Supervisory Writ to the Juvenile Court, Parish of Jefferson

**CRAIN, J.**, dissents with reasons.

The majority finds the juvenile court "abused its discretion" in denying the motion to suppress. I would adopt the *de novo* standard of review as articulated in *Ornelas v. United States*, 517 U.S. 690, 699, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996). However, applying the abuse of discretion standard, which is more deferential to the trial court, I disagree with the majority's conclusion.

The majority puts the events of this encounter into slow motion, parsing each fact as though it occurred in a frozen time frame, then suppresses the gun and drugs. Ofc. Verrett did not have the luxury of deciding the timing of this intervention. The entire encounter took place in a matter of seconds. That is why the observations of a trained officer, which may elude an untrained eye, are entitled to deference. *State v. Huntley*, 97-0965 (La. 3/13/98), 708 So.2d 1048, 1049.

At issue is the permissible intrusion we must endure to accommodate a law enforcement officer investigating a completed crime. This case does not involve determining "reasonable suspicion" that the defendant committed or is in the process of committing a crime. In fact, here, the intervention does not involve the person of interest, who fled before being identified. Rather, the defendant was traveling with that person of interest who bore similarity to the perpetrator of an unsolved carjacking, a violent felony crime, that occurred the day before. Resolving the issue

1

before us requires weighing the government's interest for the intrusion against the defendant's right to privacy and personal freedom. To be considered are the manner and intensity of the intrusion, the gravity of the crime being investigated, and the circumstances surrounding the encounter. I believe the totality of the circumstances dictate that both the seizure and search of the defendant were objectively reasonable, thus constitutional.

The keystone to Fourth Amendment analysis is reasonableness. *Sampson v. California*, 547 U.S. 843, 855, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006). The protections of the Fourth Amendment extend to brief investigatory stops. *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). An officer may stop and question a person if there are reasonable grounds to believe that person committed an unsolved crime. *U.S. v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981). The *Terry* stop is a minimal intrusion, simply allowing the officer to briefly investigate further. *Illinois v. Wardlow*, 528 U.S. 119, 126, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). Such investigatory stops require reasonable suspicion of criminal activity, which is something less than probable cause. *Huntley*, 708 So.2d at 1049.

Reasonable suspicion requires only a minimal level of objective justification. This includes knowledge of recent crime patterns or incidents of crimes. *State v. Martin*, 99-123 (La. App. 5 Cir. 6/1/99), 738 So.2d 98, 102. "[N]ervous, evasive behavior is a pertinent factor in determining reasonable suspicion" and "[h]eadlong flight–wherever it occurs–is the consummate act of evasion: it is not necessarily indicative of wrongdoing, but it is certainly suggestive of such." *Wardlow*, 528 U.S. at 124. Police can conduct a *Terry* stop if they have reasonable suspicion the stop may produce evidence of a crime, even if officers do not have reasonable suspicion to believe the individual being stopped was directly involved in the crime. *U.S. v. Marxen*, 410 F.3d 326, 332 (6th Cir. 2005).

The totality of the circumstances here are critical. Ofc. Verrett was alone. It was after 10 p.m. on Saturday night. The defendant was a juvenile. The defendant was traveling with three other people. An unsolved carjacking occurred the previous day at block 700 of 27th Street, which was characterized by defense counsel as "well over a mile away." When passing Ofc. Verrett, the person of interest purposefully hid his face by covering it with his hair. Then, when asked to stop, he and his two other companions ran. The identity of the carjacking suspect was not known. That person was still at large. He may have been in the officer's presence, until he ran to avoid contact.

The defendant was traveling with the person Ofc. Verrett suspected may have committed the carjacking. The majority holds that Ofc. Verrett had no reasonable grounds to stop the defendant, even given the likelihood that the defendant knew the identity of the person of interest. The defendant was stopped to further this investigation. Given the totality of these circumstances, reasonable suspicion existed.

There was a compelling government interest in solving the violent crime that occurred in this community the day before this encounter. The likelihood that the defendant knew the identity of the person of interest who bore resemblance to the felony perpetrator was high, since they were traveling together. The fact that the person of interest fled upon being confronted by police intensified the need to learn his identity. In light of these facts, the stop was completely reasonable.

Next, the officer patted down the defendant and unzipped his jacket. There, he found a satchel which Ofc. Verrett touched and felt a gun. This encounter took only seconds. Ofc. Verrett was alone, at night, with three people who had fled his presence, whose whereabouts were unknown, and who were being stopped as part of the investigation of an unsolved violent crime committed the day before. This intervention was minimally intrusive given the circumstances.

3

The majority dismisses these facts, pointing out the defendant was not the person of interest who was believed to have committed the carjacking. That point is immaterial. The defendant was stopped because he likely had information related to an unsolved violent crime. *See United States v. Lewis*, 674 F.3d 1298, 1306 (11th Cir. 2012) (noting that for safety reasons, officers may in some circumstances, briefly detain individuals about whom they have no individualized reasonable suspicion of criminal activity in the course of conducting a valid *Terry* stop as to other related individuals).

The majority states that a frisk can only occur on the outer garment when the officer fears for his safety, then concludes Ofc. Verrett did not fear for his safety. Thankfully, he had enough fear to perform a very limited search because, in fact, he was in danger. The defendant possessed both a gun and drugs. To state that Ofc. Verrett was unjustified in finding the gun because the defendant did nothing suggestive of concealing anything is stunning. He was concealing something–a gun strapped tightly across his chest. These are the encounters that get police officers shot. This defendant had no reasonable expectation of privacy under the totality of these circumstances. There was no unconstitutional search or seizure. While the Fourth Amendment must be rigorously applied to prevent government overreach, it should not be a license to commit crime. The juvenile court correctly denied the defendant's motion to suppress. I dissent.

4